May it please the court, Michael Patterson on behalf of the appellant Jodi Coy. There are four separate reasons to reverse the district court on the failure to grant the summary judgment as it relates to qualified immunity. One is the evidence relied upon and assumed by Judge Leighton for purposes of denying that motion were not supported by the record. Number two, even if those facts were accurate and we indicate that they are not, not supported by the record, there was no constitutional violation. This safe room was authorized by the laws of the state of Washington and I might point out that Senate Bill 1240 which is going to be enacted at the end of this month, once again still allows that safe room to be operated. That could be unconstitutional though, right? The fact that some law says it's okay doesn't mean it necessarily is. That's correct, but the issue is whether or not Jodi Coy had an objective, reasonable basis. That's a qualified immunity issue. I think you said it's not unconstitutional because this law authorizes it. What factual assumptions did the district court rely on that you say are inaccurate? Can you summarize that for me? Yes, I will. Judge Leighton indicated that there are material questions of fact and he indicated this. Cody locked a seven year old autistic child in a small enclosed dark room. So you moved for summary judgment, right? So doesn't the district court have to make all factual inferences in favor of the plaintiffs and wasn't there evidence that the door was locked because a chair was put against it? Isn't that at ER 67? No, because if you take a look at the only record on that is Deanie Wollman. Deanie Wollman worked there in that classroom for three years. All the relevant events occurred here between September 2003 and early January 2004. If you take a look at her declaration, she does not specifically indicate that DP was locked in that room. But if she says that usually or sometimes a door was put against it, couldn't a factual inference that you could draw from that on summary judgment be we should think that this may have been locked some of the time? No, I think the better factual inference, given the animosity that Deanie Wollman has obviously for the school district, is that if in fact that happened when DP was in that room that she would have said that that's what happened to DP. But you're saying for purposes of the Fourth Amendment the allegations are going to have to be specific as to DP and not just generalized practices of what could have happened to other children. I believe so and Ashcroft I think was clear on that and indicating that even to the Ninth Circuit saying do not rely upon generalities. You have to look at specifics. The third reason is obviously there was no clearly established constitutional right against safe room use or having a childless system. I'm sorry. I'm going to hopefully have time to let you get to your third basis. I'm trying to get to your factual inaccuracies. So number one, the district court thought it was locked and there's no specific allegation that the door was ever locked as to DP. And then were there other facts that you... And he says in a small room. The record is it was five by three by five by eight. The other indication is it was enclosed. Well it was enclosed to the point of there was space, a foot of space, between the ceiling and the top of this safe room. And then he said it was a dark room, when in fact the evidence is that there was a ceiling light above this safe room that provided light into that room. And he goes on to indicate that he was put in there for indeterminate periods of time. When the record clearly indicates, once again Deanie Woolman does not specifically indicate DP was in there for indeterminate amounts of time. The only viable record here is from Jody Coy who indicates that the longest he was in there was five minutes. It never exceeded five minutes. And the record indicates that he was in there 31 times during this period of time. And I know there's going to be a question being asked, well what about the defecation in the room on one occasion? That was one out of 31 times and it did not happen on the first occasion. It happened later after he'd been in there several different times. And I might also point out in the record that that is not the only place that he defecated. Deanie Woolman indicated that he defecated on the playground. So if the inference is that he defecated out of fear, that is simply rebutted by the fact that he defecated out on the playground in a swing tire out there. I want to make sure I have this correct. Does the record reflect that he also defecated on the floor and that it was this last time that Coy had DP assist in cleaning up the mess? Is what I just said an accurate statement from the record? I don't believe so. What's wrong with it? My record indicates that he urinated three times and that's at 1337, 1338, 1340. And that the defecation was not the last time that that occurred sometime before January 2004. And that yes, indeed, she did have him assist. The one time? The one time. And that's the only time that he ever defecated in that safe room. Once again, he did it out on the playground area. Right. And help me with this too, please. Coy concluded based on her experience that DP did not urinate and defecate in the safe room because he was in distress, but rather was an intentional act to gain attention. My question is, was Coy qualified to make that determination? Well, I believe she was, your honor. I think her testimony was that he was simply anting up the resistance that he was giving. She has a bachelor's degree in this area from the University of Washington and also has a master's in social work in this area. So I think she's qualified to give that opinion. What do I do with Mrs. Payne's testimony that DP's behavior worsened as a result of the safe room? You know, for example, biting his lip, nightmares, that sort of thing. Well, I don't know that she's qualified to give that opinion relative to the standards in the state of Washington on evidentiary ruling. She can certainly give observations, but to make that causal connection, I don't think she's qualified to do that, your honor. Do you want to move to your third reason? Yes. And the third reason was there's no clearly established constitutional right against the safe room. And I'm sure that the case of Gierks will be, or probably was going to be asked as to whether or not that was a similarly factual basis under which there'd been clearly established. But in that particular case, the child had a documented fear of bathrooms. And the child was confined in that bathroom for two hours. And as I understand it from the record in that case, that child was asked to clean up that excrement solely by himself. So there's obviously the big difference there. And the court might also ask with regard to these issues as to whether or not, because we didn't strictly comply with IDEA, we didn't strictly comply, and I will concede that we didn't strictly comply with those issues, that we didn't strictly comply on home journals being provided, those sorts of things. But I think the Couture case made it clear that, for example, in that case, the timeout rooms were to remain unlocked and free and clear of obstructions and be clean and well-lit, etc. And that was not done in those cases. And yet the court went on to say, the Supreme Court said, officials do not lose their qualified immunity merely because their conduct violates some statutory administrative provision. And I think that was re-edified in Rasmus v. Arizona, where an 8th grade emotionally disturbed boy was locked in a timeout room. The door lock violated the fire code in that particular case. And the court held that qualified immunity was granted, since at the time, the individual defendant's conduct was not so offensive that they would have recognized they violated constitutional law. And I think it's important to recognize that the standard here is one that we need to... Can I stop at Rasmus for a second? So Rasmus said there was qualified immunity, but it said that this could be a Fourth Amendment violation. And the facts in Rasmus are pretty similar to yours. So once Rasmus has decided, why wasn't your client on notice that this was a constitutional violation? Or could have been, at least. Why doesn't there at least need to be a trial about that? Well, number one is, in this particular instance, that safe room was authorized and did not have the similar restrictions that the state of Arizona did, as I understand it, in the record at that particular point in time. Also, in the state of Washington, you have some RCWs and WACs that allows reasonable force to be used in working with students when that becomes necessary due to the student's behavior. And the behavior here was pretty egregious. I mean, it was behavior that was dangerous to not only the people that were teaching, the educators in that room, but to himself, and also to fellow students. And there's a WAC that approves the use of isolation rooms in situations such as we have in this case. But again, that doesn't really tell us whether it's constitutional or not, does it? So, I mean, in Rasmus, I think the key issues were that the room was locked, and that the safe room was being used as punishment. Now, I know you don't think that there's evidence here that the room was locked, because we were talking about that before. But as I read the Woolman declaration, she says that the room was basically always locked, or someone was sitting against it when it was used. So it doesn't mention DP in particular. But if she's saying it's always locked, why is that not at least something that raises a question of fact? Well, once again, I think the court's been clear that the generalities simply don't apply here. But why is that a generality? I mean, she's saying, I'm looking for the specific page here. She says, when the isolation room was used to punish children, Jody Coy would instruct that we keep the door completely shut by either sitting against it or wedging a chair diagonally under the doorknob. That is not exactly the same mechanism as in Erasmus. But if you're blocking the door, and she's saying that's what we did, why is that a generality? For two reasons. One is she was in that room for three years, not just 03-04 school year. She was in there 02-03, 03-04, 03-04-05. I don't know what she's referring to as to what particular year she's referring to. But when she wants to be specific, she is very specific. And in the record, 741, she says... Was there a deposition taken of her? Yes. And did you ask, was it always the practice? I mean, what was the answer? Did she stick by this? She, well, she did two declarations here. And the point I want to make here is this. In 741, she says, at no point was she physically abused, hit or beaten, or mentally abused, i.e., verbal lashing, by myself or any other staff member at Artendale, which include the times she was taken to the safe room. That's a different question than whether it was locked, isn't it? Well, the question is whether... Well, and in particular, in the case of, I think it was Erasmus, and also in the case of Gierks, well, Gierks was confined in the bathroom at that particular point in time. Well, I don't think I heard the answer to Judge Friedland's question as to whether, during the course of whether it's deposition or other declaration, she ever addressed specifically whether the door was ever locked as to DP. It's not in the record. It's not there, but if it is, it would be helpful to point us to it. It's not in the record. I'm going to submit to you that she basically, I mean, she says she does not specifically isolate DP except for when she wants to deal with those issues. One of them was one I just quoted there where there was no punishment, and the standard is whether or not Jody Coy had an objective, reasonable basis for doing what she was doing, and the accepted basis for doing that, which was recognized, was an aversive behavioral intervention, especially dealing with his behavior, which was dangerous to her, the students, and himself, and I'd like to reserve the rest of my time if there's no other questions. Certainly. Thank you. May it please the court, my name is Kevin Hastings, and I represent the plaintiffs' appellees in this case. I want to start out by just clarifying a couple things in the record. Ms. Wollman's deposition was not taken, so the declaration that we have in the record is all that we have in the record. Why was that? Did they try to take her deposition? So we tried to arrange it, but it came down to a pretty shortened timeline, and the notice of appeal was filed on the eve of trial about a month before, and it just didn't end up happening, so her declaration was obtained for purposes of summary judgment, and then it wasn't. So she kind of seems like a witness for you, but she was put forth as a witness for the defendants? I mean, she's...who used this declaration? Did you put it in evidence, or did they? That's correct, Your Honor, yes. Wait, I asked which one put it in evidence. We put it in evidence, the plaintiffs. So they were the ones who would have taken her deposition? That is correct, Your Honor. Was there a second declaration? Not from Ms. Wollman, no. There's a letter, though, in the record from Ms. Wollman that she wrote to Ms. Coy around the time of all this was happening in that 04-05 time period, about a year later, and I believe that that is attached to the declaration of Mr. Bertittas in support of our motion for summary judgment. Opposition? Now, looking at the facts most favorable to your client, correct me if I'm wrong, or point me to additional evidence if you have any in the record. You've got the fact that Ms. Coy is inexperienced in teaching developmentally disabled children, but yet was put in charge of the special education class. You've got a declaration from Ms. Wollman talking about generalized practice, but it doesn't address specifically how the safe room was used as to DP, right? What else is there in the record? That is correct, Your Honor, that Ms. Wollman's declaration does not address DP specifically, but it's our theory, and it would be our trial presentation, that this was a custom and practice of Ms. Coy. No, I understand that, and I'm going to have you go back to addressing how the Wollman declaration can be interpreted, all the reasonable inferences that can be drawn from it, but I just want to make sure that I'm not missing something else in the record that could be construed in your client's favor, some evidence that's there that I haven't mentioned so far. Well, Your Honor, I would direct the court to ER-0183, which is a letter that Ms. Payne wrote to Representative Patricia Lance in around 2004, memorializing some of the stuff that happened, and that she would use it to break in. And this also answers your question, Judge Jahari, about three of these occasions our son was left in the room for such a period of time without supervision that he stripped down naked, urinated, and defecated in the chamber. All right, so Ms. Payne's information regarding how his condition worsened and how it was used as to her child, right? Correct. So, I'm sorry, could you repeat the question, Your Honor? Anything else? I'm trying to make sure that I get all the pieces of evidence that I should be looking at and construe those facts and all reasonable inferences in your client's favor. We have a letter that Ms. Payne wrote to Ms. Coy in 2004, in the spring, that also discusses some of the incidents that happened in that fall. We have the declaration of Joyce Sears that discusses the safe room in paragraph 8 of her declaration, and that's found at 1122, ER-1122. And then, Your Honor, we also have the handwritten notes that Ms. Coy wrote to Ms. Payne, and they start at ER-1336. So, there's another thing that I wanted to clarify as well. I understood when Mr. Patterson opened his argument that it was put at issue with regard to whether these instances violated the Constitution. And I read the opening brief as that not being an issue here today for the court to decide, and that it's limited narrowly to the issue of only whether the law was clearly established at the time. And we can see that in the opening brief as well as in the reply brief when... So, how does the record show that the school district or Ms. Coy violated a clearly established Fourth Amendment right? So, we have the cases, the Rasmus case in 1996, which held that a seizure was unreasonable in that situation, that there are issues of fact as to that. We believe that that is one case that would provide adequate notice. So, we see the court shifting from a Fourth Amendment excessive force analysis into incorporating it into the Fourth Amendment analysis. And by 2003, we have the Doe v. Hawaii case that says that excessive force against students for disciplinary purposes is a clearly established right. And to the extent that that might be... This wasn't excessive force though, right? This is more like the seizure, more like Rasmus, isn't it? I mean, they weren't beating him. Correct, Your Honor. They were not beating him. But it is excessive to the extent of how it happened. So, in that Fourth Amendment analysis, we have the when and the how. When these seizures took place, it's our position that they were not justified at their inception, as well as how they were executed was also exceeding the bounds of law, which would be more akin to an excessive force analysis under the Fourth Amendment. And then the 14th Amendment we have in there, and that is pertaining to the cleaning of excrement, because that doesn't fall under the rubric of the Fourth Amendment analysis. What do I do with DP's history of physically aggressive behavior? Would you agree with me that it would be appropriate for Coy to place DP in the safe room after he bit Ms. Bowers, sending her to the hospital? Your Honor, I wouldn't agree necessarily with that. I think that it would depend on a few important facts. Well, based on what we have on the record, isn't there sufficient information to support the use of the safe room in certainly that context? Only to the extent that it fell under the IEP, and it was consistent with that, and what was discussed. So what do I do with the evidence in the record that placement of DP in the safe room was consistent with his IEP? So we do have evidence that Dylan did act out and had aggression, but we also have evidence in the declaration from Ms. Woolman that Ms. Coy would put children into the safe room for any reason. Let's talk about DP and not other children. What do I have on DP and his IEP that is in any way inconsistent? So for DP, the evidence is that Ms. Coy was attempting to break him, and that she would put him into the room for reasons that aren't entirely clear, and really the only evidence that we have is her own testimony. Ms. Payne was excluded from the classroom at a point in the spring. You got Ms. Woolman's declaration, right? Correct. So you talked to her in preparing this declaration, I'm assuming? I did, Your Honor. And the declaration didn't commit to knowledge that DP was being put in the room under the circumstances that are described in the Woolman declaration that would be problematic, placing a chair against the door, keeping it closed. So that information could have been there, but really isn't there. And I think the nature of Fourth Amendment claims is it has to be more particularized as to DP, and I see this as being a generalized declaration, not specific as to DP. So how should we deal with that? Well, Your Honor, the underlying instance happened in 2003-2004. Ms. Woolman's declaration wasn't obtained until 2013. So there is an issue with fading memories, which if we do actually end up trying the case will obviously be an issue even then. You are going to try some case, right? Isn't there still a negligence claim and an outrage claim that are left and going to trial regardless of what happens here today? That is correct, Your Honor. In fact, we have a Monell claim as well. And but the real thrust of this case is and has always been Ms. Coy and her unreasonable use of the safe room on a student that it shouldn't have been used in that fashion, and it should have been used more carefully. It should have been better documented. Do the negligence claim and outrage claims not go to Ms. Coy and her conduct? They would, Your Honor, yes. Well, the negligence claim is against the district. And I believe that the outrage... But you mentioned fading memory. If her memory has faded as to whether the safe room was used improperly as to DP at the time you took her declaration for purposes of summary judgment, it's not going to improve by time of trial for purposes of the Fourth Amendment claim, right? So the gap is still going to be there. Yes, Your Honor, unless there was something that she has a sudden memory of or left out. But yes, that is correct, Your Honor. We tried to capture as the best we could. What do I do with the Payne's consent to the use of the safe room? So the consent is an interesting issue, but we know that at least there were three times when Dylan was put into the safe room without any sort of IEP in place. That was early, but in September... Early September. That is correct, Your Honor. But it's also a little bit unclear when exactly the IEP and aversion therapy plan went in place and how many times Dylan was put into the safe room during that period. And in fact, there's also evidence... We have to find that it was totally unreasonable, some kind of excessive punishment, some kind of inappropriate seizure. That doesn't really turn on whether the IEP was a few weeks away or still being worked out or whatever, does it? That's correct, Your Honor. So the inquiry, yes, here today is whether a reasonable official in Ms. Coy's position would have known that doing what she was doing was unreasonable. And I would say that it is absolutely... It would be unreasonable. In fact, we have the superintendent's testimony that I took... Although you sit down with the IEP team and you propose the safe room as an option to deal with disruptive and potentially dangerous behavior, and the parent signs off on that, that would go to reasonableness, though, wouldn't it? So Ms. Payne was clear in her testimony that she never gave consent for Dylan to be in the room with the door shut. And she was also under the understanding that there was going to be stuff in the room, like a beanbag, something comforting that he could go in there, not just a barren room where he would... With the door shut in a dark room. Dark was also brought up as a disputed fact, but we also know from Ms. Sears and Ms. Woolman's declarations that, in fact, there is evidence that it was dark. So maybe the light was not... That was allegedly overhead was not... Maybe it was taken out. Maybe the bulb was taken out, but... But the Home Journal does reflect that Mrs. Payne was well aware that DP was in the safe room with the door closed, does it not? Yes, Your Honor. Ms. Payne, she didn't know the extent in which it was occurring, I would say. And I don't think, though, that that goes to make Ms. Coy's conduct reasonable. She's the professional in the situation... The parents didn't right away say, you've got to stop using the safe room. It went on until January. They apparently didn't act like something so outrageous or unreasonable was going on that it had to be stopped that day or that next day or even the next week. Well, Your Honor, and I think that this is just a situation where we have parents trying to do what they can for their children and being in a position where that's the school that Dylan was going to. She didn't want to sour a relationship, and she was trying to work around things. And in the notes back and forth, we can see that there is resistance there, that she is trying to explain that this isn't good for Dylan. Let's stop using it. And we saw a deterioration that occurred over the course. And it finally culminated in December, where Dylan was chewing holes through his clothes. And it became apparent at that point that this is really affecting him, and this needs to stop immediately. I'm sorry. I have one last question, if I can interrupt you. Unless you want to finish your answer, go ahead. No. Thank you, Your Honor. How do I reconcile the testimony of the classroom staff? I'm going to set aside Ms. Coy for the moment. The classroom staff who were present with DP with the district court conclusion of child abuse. And in particular, we have Woolman admitting there was no mental or physical abuse at the record at pages 741 and 742. And Bowers, the same conclusion at the record, 262-63. So we have Coy. We have the other classroom staff. And I'm trying to find how the district court concluded child abuse took place, when their testimony reveals a different opinion. Which paragraph in Ms. Woolman's declaration, Your Honor? I don't have that in front of me, other than the sites of 741 and 742. But tell me from recollection, if you can, what I'm missing there, if I am missing something. As far as the educators in the classroom? Correct. Who are present every day with DP, with Coy, if not every day, many days. They're there. And they're not supporting the argument that your clients are making here. Well, I would say that what Ms. Coy was doing had a fundamental lack of knowledge as to how autism works and how students would respond to it. And so it's really viewed in that context with the particularities of the children in the classroom, as far as that this is tantamount to child abuse. And I think that we can get that from the TLO case, that when we're considering these seizures, that we're looking to the particularities of the children here. And that's what underscores, in part, why this was so manifestly unreasonable. We have whacks out there that say, you can't do this. And if you do, here are the very limited situations in which you can do it. You have to maintain direct sight. You can't lock the door. If you're going to lock the door, then you have to absolutely maintain direct sight. And these are all entrenched in the whack. And then we have the superintendent, whose deposition I took, and he said, you wouldn't do that. An educator wouldn't do that. Wouldn't put- So maybe you have a good negligence claim. I mean, why does this need to be a constitutional claim? Why can't you pursue the regular state law remedies that you're already pursuing anyway? Well, Your Honor, it's our position that this rises to the constitutional magnitude of being an unreasonable seizure and excessive for a young second-grade student, seven years old, who has autism. And there is evidence in the record. Is there anything you'd be able to recover by convincing us this is a constitutional claim and there's no qualified immunity that you couldn't recover with your other claims? Well, you know, Your Honor, this is, again, the thrust of this case is really with what Ms. Coy did. And that's really the purpose of this. Right. Her conduct is at issue, no matter what claim goes forward, negligence or Fourth Amendment violation. But we understand your argument. You're well over time. I thank you very much for your argument. Thank you. Just briefly, I did misspeak. I know there was efforts to set up Dina's deposition. It never occurred. But there were two declarations, one in 2013 at the record on 53, one in 2006 at 741. The key here is objective reasonableness. And I might point out that Coy's credentials indicated a BS in developmental psychology and an MSW with certification in elementary school social work. And if you take a look at Rasmus, and clearly they found qualified immunity there, then certainly that could be a clearly established case that she could rely upon. No, but that's not how it works, right? I mean, a court can find that something is a constitutional violation, but then also say there's qualified immunity because it wasn't clear yet. But once you have that decision, the next case is clearer. So saying that there was qualified immunity in Rasmus doesn't tell us anything, does it? Rasmus came first. Rasmus came in 1996. That's correct. But in that particular case, this was a boy that was clearly unequivocally locked in the timeout room for 10 minutes. The door was locked, violated the fire code, and the timeout violated the state educational department advisories. And when we're talking about objective reasonableness here, we're taking a look at the Ashcroft case, and it clearly indicates that you have to have a clearly analogous preexisting case law. And I might point out that the Ninth Circuit PB versus Koch set out this standard. And it's whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism, rather than merely careless or unwise excess zeal, that it amounted to brutal and inhumane abuse of official power, literally shocking to the conscience. And my point is, is that given the background, given the fact that safe rooms were allowed, given the fact that aversive behavioral intervention was an appropriate tool for educational purposes, given the objective reasonableness and the background of Jody Coy, that you're correct, Judge Freeland, that there may be issues with regard to negligence, but with regard to violation of constitutional rights, either under the 14th or Fourth Amendment, it simply does not meet those standards. I think we've got it. Thank you very much for your argument as well. Matter is submitted for decision.
judges: Zouhary, Nguyen, Friedland